UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
LEITICIA CASTANEDA,                     )
                                        )
              Petitioner,               )
                                        )
              v.                        )      CIVIL ACTION
                                        )      NO. 13-10874-WGY
STEVE SOUZA, Superintendent of          )
Bristol County House of Correction,)
                                        )
              Respondent.               )
_____)
```

MEMORANDUM

YOUNG, D.J.                                    July 3, 2013

I.  **INTRODUCTION**

In this case, this Court determined that petitioner Leiticia Castaneda ("Castaneda") did not fall within the scope of the mandatory detention provisions set forth at 8 U.S.C. section 1226(c).  Castaneda, a native and citizen of Brazil, sought a writ of habeas corpus challenging her detention by U.S. Immigration and Customs Enforcement ("ICE") of the U.S. Department of Homeland Security.  Castaneda claimed that her detention violated the law and her Fifth Amendment due process rights because she was being detained without having received an individualized detention hearing.  No hearing was given because, ICE claimed, Castaneda was subject to the mandatory detention

provisions of Immigration and Nationality Act ("INA") section 236(c), 8 U.S.C. § 1226(c) ("section 1226(c)").[1]  Castaneda argued she was not subject to these mandatory detention provisions and thus must be granted an individualized bond hearing.

Castaneda had been detained at the Bristol County House of Correction since March 18, 2013.  Steve Souza ("Souza"), as the superintendent of that facility, was the respondent in this case.

Souza moved to dismiss the petition for failure to state a claim.  Because the only issue in dispute in this case was the legal interpretation of 8 U.S.C. section 1226(c), this Court was in a position to resolve the merits of this case.

On June 10, 2013, this Court denied Souza's motion to dismiss, granted Castaneda's petition, and ordered that she be provided with an individualized bond hearing by June 19, 2013.[2]  Order, ECF No. 24.  The Court also noted that this memorandum would follow to explicate the reasoning which led to that order. Id.

---

[1] The Court will refer to this provision by its U.S. Code section: section 1226(c).

[2] This Court notes that the government has complied with its order by first scheduling a bond hearing for June 17, 2013, and then by ICE choosing to release Castaneda on her own recognizance and pursuant to GPS monitoring.  See Notice Release, ECF No. 25.

### A.   Procedural Posture

Castaneda filed her petition for a writ of habeas corpus on April 12, 2013.  Pet. Writ Habeas Corpus Pursuant 28 U.S.C. § 2241 ("Pet."), ECF No. 1.  Souza moved to dismiss the case for failure to state a claim on May 1, 2013.  Resp't's Mot. Dismiss, ECF No. 6; Resp'ts' Mem. Supp. Mot. Dismiss ("Souza Br."), ECF No. 7.  Castaneda filed in opposition to the motion to dismiss on May 15, 2013.  Pet'r's Mem. Opp'n Resp't's Mot. Dismiss ("Castaneda Br."), ECF No. 14.

After seeking leave to file an amicus brief, Mot. Leave File Amicus Curiae Br., ECF No. 12, and receiving permission to file such a brief, see Elec. Order, May 20, 2013, ECF No. 16, the American Civil Liberties Union of Massachusetts ("ACLU-Mass") filed an amicus brief on May 22, 2013, Amicus Curiae Br. Am. Civil Liberties Union Mass. (Leave File Granted May 20, 2013), ECF No. 18.  Souza filed a reply to Castaneda's opposition and a response to the ACLU-Mass amicus brief on May 29, 2013.  Resp't's Reply Pet'r's Opp'n Resp't's Mot. Dismiss (Leave File Granted May 20, 2013) ("Reply"), ECF No. 19.

On June 3, 2013, the Court heard oral argument and took the matter under advisement.  Elec. Clerk's Notes, June 3, 2013, ECF No. 21.  On June 10, 2013, this Court denied the motion to dismiss and granted the writ of habeas corpus, ordering that Castaneda receive an individualized bond hearing by June 19,

2013.  Order, June 10, 2013, ECF No. 24.  This memorandum
further explicates the reasons for that order.

### B.    Facts

Castaneda is a native and citizen of Brazil who entered the
United States in 2000 when she was seventeen.  Pet. ¶ 14.  On
October 6, 2008, Castaneda was placed on probation in Lowell
District Court for drug possession class B.  Id. ¶ 15.  She was
discharged from probation on February 5, 2010.  Id.  On March
18, 2013, ICE took Castaneda into custody and issued a Notice to
Appear charging her with inadmissibility under INA section
212(a)(2)(A)(i)(II), as an alien convicted of, or who admits
having committed, a controlled substance offense.  Id. ¶¶ 16-17.
An immigration hearing officer denied Castaneda an
individualized bond hearing, ruling that she was subject to
mandatory detention under section 1226(c).  Id. ¶ 18.

### C.   Federal Jurisdiction and Venue

"Writs of habeas corpus may be granted by . . . the
district courts . . . within their respective jurisdictions."
28 U.S.C. § 2241(a).  Here, the writ of habeas corpus may extend
to Castaneda if she, as she claims, "is in custody in violation
of the Constitution or laws or treaties of the United States."
Id. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490
(1989) (per curiam).

Venue is proper in the District of Massachusetts under 28 U.S.C. section 1391(e) because the petitioner is being held within the district at the Bristol County House of Corrections where Souza, being sued in his official capacity, is the superintendent.  See Rumsfeld v. Padilla, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.").

## II. ANALYSIS

As the parties confirmed during oral argument, resolving this case requires no factual findings.  Rather, this Court is tasked with determining whether Castaneda falls within the scope of the mandatory detention provisions set forth at 8 U.S.C. section 1226(c).[3]

---

[3] This question has resulted in two circuit court opinions of which this Court is aware.  Sylvain v. Att'y Gen., 714 F.3d 150 (3d Cir. 2013); Hosh v. Lucero, 680 F.3d 375 (4th Cir. 2012).  Those two opinions were recently criticized by Judge Raymond Moore.  See Baquera v. Longshore, No. 13-cv-00543-RM-MEH, 2013 WL 2423178, at *4-6 (D. Colo. June 4, 2013) (criticizing both circuit opinions, aggregating cases, and noting that "the clear majority of the district courts that have ruled on this issue" have interpreted mandatory detention not to apply to aliens taken into ICE custody long after their previous release, id. at *4).  This Court recognizes the ongoing judicial debate and hopes that its contribution can push the debate toward resolution.

A.   **Legal Framework**

When interpreting a statute, the administration of which has been entrusted to an agency, courts must answer two questions: (1) has Congress spoken clearly on the issue; (2) if not, is the agency's interpretation reasonable?  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.  On the other hand, where Congress has left a gap, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the . . . agency."  Id. at 844.

When interpreting a potentially ambiguous statute, the court must determine whether a clear congressional intent exists using all of the "traditional tools of statutory construction." INS v. Cardoza-Fonseca, 480 U.S. 421, 448 (1987) (quoting Chevron, 467 U.S. at 843 n.9); see also id. ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." (quoting Chevron, 467 U.S. at 843 n.9) (internal quotation mark omitted)).  To determine whether a clear congressional intent exists, courts both look to "the most

natural reading" of the statute and use other interpretive tools.  Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005).  As always, this Court must begin with the text of the statute itself, see id., but remember that "the 'plain meaning' of a statutory provision is often made clear not only by the words of the statute but by its structure as well," Saysana v. Gillen, 590 F.3d 7, 13 (1st Cir. 2009).  In construing the meaning of a particular word, courts must consider the context in which it appears.  See Leocal v. Ashcroft, 543 U.S. 1, 9 (2004). Finally, if clear congressional intent cannot be discerned based on the words alone (including their structure and context), then courts can rely on the conventional tools of statutory interpretation such as the purpose and history of the statute, see In re Hill, 562 F.3d 29, 34 (1st Cir. 2009), standard presumptions, see, e.g., Kucana v. Holder, 558 U.S. 233, 251 (2010), and legislative history and purpose, see General Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 597-600 (2004).

Should the court determine that despite the application of these traditional tools "the statute is silent or ambiguous with respect to the specific issue, [then] the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  The second step of Chevron analysis is reached only if no clear

congressional intent emerges at step one.  See Harvey v. Veneman, 396 F.3d 28, 33-34 (1st Cir. 2005).

**B.    Applying the Legal Framework**

**1.    Statutory Text**

As it always must, this Court begins its analysis with the statutory text, see Leocal, 543 U.S. at 8, which reads:

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.  Except as provided in subsection (c) of this section and pending such decision, the Attorney General --

(1) may continue to detain the arrested alien; and

(2) may release the alien on --

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

    (1) Custody

The Attorney General shall take into custody any
alien who --

        (A) is inadmissible by reason of having
        committed any offense covered in section
        1182(a)(2) of this title,

        (B) is deportable by reason of having
        committed any offense covered in section
        1227(a)(2)(A)(ii), (A)(iii), (B), (C), or
        (D) of this title,

        (C) is deportable under section
        1227(a)(2)(A)(i) of this title on the basis
        of an offense for which the alien has been
        sentence[d] to a term of imprisonment of at
        least 1 year, or

        (D) is inadmissible under section
        1182(a)(3)(B) of this title or deportable
        under section 1227(a)(4)(B) of this title,

        when the alien is released, without regard
        to whether the alien is released on parole,
        supervised release, or probation, and
        without regard to whether the alien may be
        arrested or imprisoned again for the same
        offense.

    (2) Release

The Attorney General may release an alien
described in paragraph (1) only if the Attorney
General decides pursuant to section 3521 of Title
18 that release of the alien from custody is
necessary to provide protection to a witness, a
potential witness, a person cooperating with an
investigation into major criminal activity, or an
immediate family member or close associate of a
witness, potential witness, or person cooperating
with such an investigation, and the alien
satisfies the Attorney General that the alien
will not pose a danger to the safety of other

persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

(d) Identification of criminal aliens

(1) The Attorney General shall devise and implement a system --

(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

(2) The record under paragraph (1)(C) shall be made available --

(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

(B) to officials of the Department of State for use in its automated visa lookout system.

(3) Upon the request of the governor or chief executive officer of any State, the Service shall

provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

(e) Judicial review

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226 (footnote omitted). The language most pertinent to the case at bar is "[t]he Attorney General shall take into custody any alien who [fits one of four categories of criminal aliens] when the alien is released." Id. § 1226(c)(1).

Castaneda argues that when Congress enacted these provisions, it intended "when . . . released" to mean "immediately upon release." See Castaneda Br. 2. Because she was not taken into custody immediately upon release, Castaneda argues that her current detention is not under section 1226(c), but rather under 1226(a). See id. at 6. Under section 1226(a), she is entitled to an individualized bond hearing. See Pet. ¶ 31(b).

On the other hand, Souza argues that "when . . . released" is ambiguous. While acknowledging that the phrase could mean immediately after release, Souza argues that another reasonable interpretation of the phrase, one adopted by the Board of Immigration Appeals ("BIA") in In re Rojas, 23 I. & N. Dec. 117

(B.I.A. 2001), is that it "describe[es] the time when the Government's duty to detain the specified criminal aliens arose." Souza Br. 6. Given that "more than one interpretation is plausible," id. at 10, Souza urges "this Court [to] defer to the [BIA's] interpretation," id. at 13.

The language of section 1226(c) is indeed susceptible to multiple interpretations. The most natural reading of "when . . . released" is the one that comports with the most common understanding of "when." "When" typically means "at the time." Thus, this Court holds that the most natural reading of "when . . . released" is "at the time of release" or "immediately upon release."

This determination, however, does not end this Court's inquiry. Instead, the Court now examines whether the other interpretive clues point in the same direction as the most natural reading and whether this Court can conclude from the language and the other interpretive tools that a clear congressional intent exists. See Succar, 394 F.3d at 22.

### 2. Context

Having determined that the most natural reading of the "when . . . released" provision is "immediately upon release," this Court now turns to the context within which those words are used.

12

Analyzing the context allows this Court to determine not only the function of the "when . . . released" phrase, but also to examine more closely how it fits in the statutory scheme. The context provides clues for Congress's intent in using these particular words.

Statutory interpretation must not render words superfluous within their context.  See Platt v. Union Pac. R.R. Co., 99 U.S. 48, 58 (1878) (noting that "Congress is not to be presumed to have used words for no purpose" and that "rules of statutory construction declare that a legislature is presumed to have used no superfluous words").  Judge Brinkema in Waffi v. Loiselle, 527 F. Supp. 2d 480 (E.D. Va. 2007), abrogated by Hosh v. Lucero, 680 F.3d 375 (4th Cir. 2012), determined that if the phrase "'when the alien is released' does not describe the class of aliens who are to be detained . . . it would doom that clause to removable surplusage."  Id. at 488.  Because such a result is highly disfavored by traditional tools of statutory construction, this analysis suggests that the phrase "when the alien is released" must describe the group of aliens subject to mandatory detention.[4]

Souza's best argument in response is that this "language . . . serves the purpose of clarifying that

---

[4] An analysis of the structure of section 1226(c) strongly supports such a conclusion as well.  See infra section II.B.3.

13

immigration authorities should not assume responsibility for aliens before their criminal incarceration has ended, but need not wait for the completion of non-custodial punishments." Souza Br. 13.  This Court rejects this contention because the word "after" rather than "when" would communicate such a meaning much more clearly.

Moreover, Judge Brinkema found that any argument for understanding "when" as a conditional in this context fails because "[s]uch a construction appears more properly placed upon the term 'whenever' or perhaps the phrase 'in the event that.'" Waffi, 527 F. Supp. 2d at 488.  This Court agrees that "when" is highly unlikely to be serving as a conditional in this context because such a condition can be more clearly communicated through a different, simple construction.

If "when" is not a conditional, then it must specify a temporal element.  "When," however, cannot mean "any time after" both because "after" would communicate such an intention more clearly and because "it would be contrary to the plain language of section [1226](c)'s command that the Attorney General take into immigration custody certain criminal aliens 'when' those aliens are released from state custody to include those aliens who had 'already' been released from state custody," id.

The context within which "when" is situated strongly suggests that it is intended as a timing element that means at

"a specific time," rather than "after," and begins a phrase further describing the group of aliens subject to mandatory detention.

### 3. Structure

Having determined that the most natural reading of the "when . . . released" provision is "immediately upon release" and that the context around that language supports such a reading, this Court now turns to the structure of section 1226. There are two structural elements in this statute which are worth explicating.  Both suggest to this Court that Congress intended the "when . . . released" language to mean immediately upon release.

First, the statute begins, not with provisions for mandatory detention, but rather with those for arrest and detention subject to an individualized bond hearing and potential release.  8 U.S.C. § 1226(a).  It states that section 1226(c) is an exception.  Id. ("Except as provided in subsection (c) of this section. . . .").  Section 1226(c), the exception for certain aliens, identifies those aliens in 1226(c)(1). Congress requires the Attorney General to take these specific criminal aliens into custody "when the alien is released."

Congress's structuring of section 1226 in this way is no accident.  Congress intended that aliens taken into custody typically receive a bond hearing; it then provided an exception

in certain cases -- certain criminal aliens who have been picked
up by ICE immediately upon release from their custodial sentence
should not be bonded out or paroled into our communities no
matter the circumstances.  See Saysana, 590 F.3d at 17 ("The
mandatory detention provision . . . outlines specific, serious
circumstances under which the ordinary procedures for release on
bond at the discretion of the immigration judge should not
apply.").  The mandatory detention provision is, thus, a limited
exception.

In making this observation, this Court is guided by First
Circuit precedent.  In Saysana v. Gillen, 590 F.3d 7, the First
Circuit examined the "when . . . released" language of section
1226(c)(1) to determine whether it meant when an alien was
released from any type of government custody or whether it meant
when the alien was released from custody for one of the
enumerated offenses.  The First Circuit ruled that under the
circumstances in that case, the statute was unambiguous and that
"when . . . released" related to the offenses listed directly
above.  Id. at 16.  In reaching that conclusion, the First
Circuit described the "system of mandatory detention created by
Congress" as "limited."  Id. at 17 n.6.

Second, section 1226(c)(1), the "Custody" provisions, does
not by itself provide for mandatory detention.  8 U.S.C.
§ 1226(c)(1).  Rather, these provisions merely require ICE to

16

take into custody a certain category of criminal aliens "when the alien[s] [are] released."  It is section 1226(c)(2), the "Release" provisions, that provide only one circumstance, not at issue in this case, under which an alien taken into custody under section 1226(c)(1) may be released.  Id. § 1226(c)(2). Thus, it is section 1226(c)(2) that actually makes detention mandatory on (nearly) all aliens taken into custody under section 1226(c)(1).  When this Court asks "which aliens are subject to the mandatory detention provisions created by section 1226(c)(2)?", the structure of the provisions suggests it is only those aliens identified in section 1226(c)(1)(A)-(D) who are taken into custody "when the alien[s are] released."  This statutory structure suggests to this Court that, when evaluating a specific case, it should make the general assumption that an alien taken into ICE custody should receive an individualized bond hearing, and only if that alien committed an offense listed in section 1226(c)(1)(A)-(D) and was detained by ICE "when the alien is released" from custody for that offense is that alien subject to mandatory detention.

This group of aliens, who have committed a qualifying offense and are detained immediately upon completing their custodial sentence, makes up the limited exception to the general bond hearing requirements found in section 1226(a). Thus, this interplay between section 1226(c)(1) and (2) comports

17

well with the "limited system of mandatory detention created by Congress."  See Saysana, 590 F.3d at 17 n.6.

Together, this Court reads these two structural elements as forming a whole that allows ICE to detain aliens subject to a removal decision.  Detained aliens typically must receive an individualized bond hearing when detained.  The exception is that certain criminal aliens who go directly from jailhouse to immigration detention must not be allowed to return to the community.

This structure is also the reason why this Court must reject the Fourth Circuit's reasoning in Hosh v. Lucero, 680 F.3d 375 (4th Cir. 2012).  In that case, the Fourth Circuit reversed a district court's grant of an alien's habeas petition for a bond hearing.[5]  Id. at 377.  In its decision, the Fourth Circuit ruled that "when" can be read in more than one way, applied Chevron deference, and determined that the BIA's interpretation was permissible.  Id. at 379-80.  The Fourth Circuit's opinion focused on the ambiguity of the word "when." See id. at (discussing various dictionary definitions of "when").  The court then concluded that because there are

---

[5]  In doing so, the Fourth Circuit explicitly noted that the district judge "[r]eli[ed] on three prior Eastern District of Virginia cases," id. at 378, and that "in the time since the district court granted Hosh's petition, other Eastern District of Virginia cases implicating § 1226(c) have also held in favor of petitioning aliens," id. at 378 n.1.

multiple dictionary definitions of "when," it "must therefore consider the BIA's interpretation." Id. at 380.  Having started with the conclusion that "[t]he meaning of § 1226(c) is not plain to us," id. at 379, and provided the dictionary discussion as the only support, the Hosh court applied Chevron deference. Id. at 379-80.

The Hosh court failed to determine whether a clear congressional intent exists using all of the conventional tools of statutory construction.[6]  See Cardoza-Fonseca, 480 U.S. at 444-48; Chevron, 467 U.S. at 843 n.9; see also Succar, 394 F.3d at 22.  For example, the Fourth Circuit does not mention context until its discussion of whether the BIA's construction is reasonable.  See Hosh, 680 F.3d at 380.  The Supreme Court, however, has made clear that to determine the meaning of a particular word, such as "when" in this case, courts must consider context.  See Leocal, 543 U.S. at 9.

The Hosh court neglected to examine the structure of section 1226 and failed to note that mandatory detention is the

---

[6] As discussed, the Hosh court determined only whether "when" could have multiple dictionary meanings, not whether clear congressional intent exists.  This lack of analysis in Hosh is startling and likely the reason why the Hosh decision has had little impact as a persuasive precedent outside of the Fourth Circuit.  See Baquera, 2013 WL 2423178, at *5 ("Presumably because of the inadequacy of the analysis in Rojas and the dearth of analysis in Hosh itself, Hosh has had little persuasive impact beyond the Fourth Circuit, where it is binding precedent.").

exception to the general rule of detention with individualized

bond hearings.  As a result, it concluded:

> Thus, while we agree that Congress's command to the
> Attorney General to detain criminal aliens
> "when . . . released" from other custody connotes some
> degree of immediacy, we cannot conclude that Congress
> clearly intended to exempt a criminal alien from
> mandatory detention and make him eligible for release
> on bond if the alien is not _immediately_ taken into
> federal custody.

Hosh, 680 F.3d at 381 (alteration in original).[7]  This conclusion

simply fails to reflect the structure of section 1226 as a

whole.

As discussed earlier, individualized bond hearings are the

norm and mandatory detention is the exception in section 1226.

See supra.  The Fourth Circuit searched for a congressional

intent "to exempt a criminal alien from mandatory detention and

make him eligible for release on bond if the alien is not

_immediately_ taken into federal custody."  Hosh, 680 F.3d at 381.

Not surprisingly, it found no such intent.  Id.  This flawed

reasoning, however, completely reverses the structure of section

1226.  Congress created a detention system where individualized

bond hearings are the norm: "The mandatory detention provision

does not reflect a general policy in favor of detention;

---

[7] In briefing, Souza significantly relies on this conclusion
by the Fourth Circuit, quoting it as the holding of the Hosh
court.  See Reply 7.  At oral argument, however, counsel
representing Souza relied primarily and almost exclusively on
the more recent Sylvain v. Att'y Gen., 714 F.3d 150, decision
from the Third Circuit.

instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply." Saysana, 590 F.3d at 17.  This provision is the exception that subjects some aliens to mandatory detention.  Rather than look for congressional intent to exempt a criminal alien from mandatory detention, courts should look for congressional intent to subject a particular criminal alien to mandatory detention.

This Court can find no support for the idea that Congress intended to subject criminal aliens already released to mandatory detention.  After all, Congress chose not to make the provisions retroactive and require mandatory detention of those criminal aliens who had completed their custodial sentence before the effective date of the provision.  See id. at 17 n.6. These criminal aliens, already in the community, could be detained by ICE, but would receive individualized detention hearings.  See id.

In determining whether Congress intended to subject criminal aliens already released to mandatory detention, this Court relies on the First Circuit's guidance from Saysana.  That court, though it interpreted the "when . . . released" language for a different purpose, stated that "the 'when released' language serves [the] more limited but focused purpose of

preventing the return to the community of those released in connection with the enumerated offenses." Id. at 17.

Castaneda has already returned to her community. See Pet. ¶¶ 15-16 (noting that Castaneda was placed on probation for her offense on October 6, 2008, completed probation on February 5, 2010, and was not detained by ICE until March 18, 2013, over three years later). The congressional "purpose of preventing the return to the community of those released in connection with the enumerated offenses," Saysana, 590 F.3d at 17, does not apply to Castaneda as she has lived in the community for three years. Given that mandatory detention would not satisfy the congressional purpose of this provision, as recognized by the First Circuit, this Court is at a loss as to what other purpose mandatory detention could serve.[8]  This Court simply sees no reason why Congress would have intended for her to be picked up years after she has reintegrated back into her community and to

---

[8] The Court recognizes that mandatory detention also facilitates actual removal, as immigration authorities have struggled often to find, detain, and physically remove aliens who are not in custody. See Demore v. Kim, 538 U.S. 510, 518-19, 528 (2003). This Court, however, is not persuaded that this potential benefit is enough. After all, by detaining Castaneda this time, ICE has actually demonstrated its ability to do so. Moreover, reading the "when . . . released" language to mean immediately upon release or within a reasonable period of time does not mean Castaneda goes free. Instead, she is entitled merely to a bond hearing. Her likelihood of complying with a deportation order is a factor in whether she is to be granted bond and released by an immigration hearing officer.

be held without presentment before an immigration judge for a

bond determination.[9]

### 4.   Clarity of Congressional Intent

Having determined that the most natural reading of the

"when . . . released" provision is "immediately upon release,"

that the context supports such a reading, and that the structure

of section 1226 further confirms such a narrow reading, this

Court now turns to determining whether anything suggests a

differing congressional intent.  If nothing supports a differing

congressional intent, this Court is comfortable in concluding

that a clear congressional intent existed to hold without a bond

hearing only those criminal aliens who were detained immediately

upon release from custody.

Here, this Court looks to the purpose of section 1226(c).

In Saysana, the First Circuit emphasized the importance of

"finding that the 'when released' language serves [the] more

---

[9] It is instructive to this Court that it cannot find a
reason why Congress would distinguish between aliens like
Saysana, who were convicted and released before the enactment of
these provisions, and Castaneda, who were convicted and released
after their enactment.  Both Saysana and Castaneda had been
living out in the community for a significant period of time
before they were picked up by immigration authorities.  Nothing
suggests that Castaneda is a greater flight risk or more
dangerous than the individuals whose release in connection with
an offense listed in section 1226(c)(1)(A)-(D) occurred before
the mandatory detention provision went into effect.  In Saysana,
the First Circuit cautioned against interpretations that "would
treat similarly situated individuals differently on the basis of
a factor not logically connected to the mandatory detention
provision." Id. at 16.

limited but focused purpose of preventing the return to the community of those released in connection with the enumerated offenses" and that this "avoids attributing to Congress the sanctioning of [an] arbitrary and inconsequential factor . . . becoming the controlling factor for mandatory detention." Id. at 17.

The government suggests that an immediate detention-after-release requirement would result in a fortuitous benefit, see Souza Br. 9-10, or an arbitrary windfall, see id. at 14-15, to a criminal alien due to ICE missing a deadline, see id. This Court, however, can understand why Congress would distinguish between those criminal aliens who have been detained immediately after their criminal custody concluded and aliens who have integrated back into their communities after ICE failed to detain them, even if that failure was simply an oversight.[10] Congress clearly intends not to take a chance with bond for all of the criminal aliens in this group. Thus, in section 1226(c), it requires their immediate detention upon completion of their

_____

[10] In this Court's experience, there is something drastically different between ordering an individual in custody to remain in custody and ordering the detention of an individual who had been free. No doubt the experience of having one's liberty stripped away is drastically different from the experience of not having it restored. An alien who is plucked out of his community should receive an individualized bond hearing to sanction this detention.

criminal sentence.  If members of this group do return to the community, however, then the calculus must change.

Two circuit court opinions have analyzed what the effect should be when ICE fails to detain an alien immediately upon release.  See Sylvain v. Att'y Gen., 714 F.3d 150 (3d Cir. 2013); Hosh, 680 F.3d 375.  Both the Third and Fourth Circuits ruled that the missed deadline for detaining the alien has no effect on the alien being subject to mandatory detention. Sylvain, 714 F.3d at 157-61; Hosh, 680 F.3d at 381-83.  This Court must, respectfully, disagree.

The Fourth Circuit presents this analysis as an alternative basis for its conclusion.  See Hosh, 680 F.3d at 381-82.  It reasons that because the statute does not provide a sanction for failure to comply with its timing, courts should not impose one. Id.  It then relied most heavily on the Supreme Court's decision in United States v. Montalvo-Murillo, 495 U.S. 711 (1990).  See Hosh, 680 F.3d at 382-83.

The Third Circuit relied entirely on the analysis that a missed detention deadline has no effect on whether the alien is subject to mandatory detention.  See Sylvain, 714 F.3d at 157-61.  While its opinion develops the line of cases more thoroughly, see id. at 157-58, it still relies primarily on Montalvo-Murillo, see id. at 158-59.

The mistake both courts make is to treat section 1226(c)(1) as a grant of authority, see id. at 157, or power, see Hosh, 680 F.3d at 381.  Treating the provision as such a grant of authority or power led both circuit courts to liken their cases to Montalvo-Murillo.  In Montalvo-Murillo, the Supreme Court examined a magistrate judge's failure to provide a detention hearing during a suspect's first appearance in court.  495 U.S. at 713-14.  The Bail Reform Act required such a hearing.  Id. The Supreme Court held that the failure to hold the hearing at the first appearance as required "does not defeat the Government's authority to seek detention of the person charged." Id. at 717.

Montalvo-Murillo is not applicable here because section 1226(c) is not a grant of power or authority to the Attorney General.  Montalvo-Murillo argued that without following the rules for a first appearance, the government had no power to hold him.  The Supreme Court rejected this argument.  Section 1226 is not about the authority to hold an alien.  Even if ICE misses the deadline for detaining the alien under section 1226(c), it still has the power to hold him under section 1226(a) subject to a bond hearing.[11]  Thus, the power to hold is

---

[11] This Court rules that the difference between the result in Montalvo-Murillo -- where the alien was seeking outright release -- and this case -- where the alien is seeking an individualized bond hearing -- is also significant.  After all,

not what is at stake.  Rather, what is at stake is the power to exercise discretion.

If the Attorney General complies with the timing requirements of section 1226(c), then the alien will not receive an individualized bond hearing.  Thus, the Attorney General, acting through an immigration hearing officer, loses the discretion to release the alien when he complies with Congress's immediacy requirement.

On the other hand, failure to take an alien into custody at the moment of release or within a reasonable period of time does not result in a loss of power or authority.  The Attorney General must grant the alien an individualized bond hearing, but can still deny bond and hold the alien.  No power or authority has been lost.[12]

Because no power or authority is lost when the Attorney General fails to detain an alien immediately upon release, this

---

"the public interest[] [is] prejudiced," Montalvo-Murillo, 495 U.S. at 718 (quoting Brock v. Pierce Cnty., 476 U.S. 253, 260 (1986)), if a suspect goes free due to a magistrate judge's oversight, but a missed deadline under 1226(c) will not affect the public interest if an individualized bond hearing is held. Moreover, while failing to provide a bond hearing at a first appearance does not change the calculus of whether bond should be granted or denied, failing to detain an alien immediately after release may allow that alien to build up equities that reveal release on bond as a better option than detention.

[12] If anything, the Attorney General gains power when he misses the deadline because it is now within his discretion either to hold the alien or to release the alien on bond.

Court must reject the analysis that concludes that such a
failure does not affect whether the alien is subject to
mandatory detention.[13]

Finally, this Court notes that the rule of lenity supports
a conclusion that section 1226(c) should be read narrowly.[14]
This rule suggests that ambiguities in deportation statutes
ought be construed in favor of the alien "because deportation is
a drastic measure and at times the equivalent of banishment or
exile." Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948). Thus,
"courts are reluctant to construe [ambiguous] statutes against
individuals whose rights would be affected without an
affirmative indication from Congress that courts should do so."
Hosh, 680 F.3d at 383.

While the potentially ambiguous provision in this case
relates to detention rather than deportation, such pre-hearing

---

[13] Note that this Court also rejects treatment of the
"when the alien is released" language as a deadline.  While
there is a temporal element to "when," the context and structure
of the provision suggest that the phrase is being used to
describe a class of aliens subject to mandatory detention.

[14] This Court recognizes the potential conflict between
Chevron deference and the rule of lenity.  See Elliot
Greenfield, A Lenity Exception to Chevron Deference, 58 Baylor
L. Rev. 1, 41 (2006) ("Court of appeals decisions indicate a
split of opinion on the issue of how Chevron interacts with the
rule of lenity."); Brian G. Slocum, The Immigration Rule of
Lenity and Chevron Deference, 17 Geo. Immigr. L.J. 515, 517
(2003) ("[T]he role of the immigration rule of lenity in
deportation proceedings is not clear due to the competing
[Chevron] deference doctrine. . . .").

detention is also quite onerous.  Not only are immigration
detainees often held in prisons and jails or conditions
indistinguishable from them, but one study has found that
whether an alien is detained also has a tremendous impact on
whether the alien's removal case has a successful outcome.  Vera
Institute of Justice, The New York Immigrant Representation
Study: Preliminary Findings (2011), available at
http://graphics8.nytimes.com/packages/pdf/nyregion/050411immigra
nt.pdf (finding that aliens are successful 74% of the time when
represented but not detained, but only 18% of the time when
represented and detained).[15]  Because of the significant role
that detention plays in the outcome of deportation proceedings,
this Court once again has to reject the Fourth Circuit's
reasoning in Hosh which downplayed the drastic nature of
mandatory detention.  See Hosh, 680 F.3d at 384 ("After all, a
criminal alien in Hosh's position would be subject to
deportation proceedings whether or not § 1226(c) existed; the
provision merely withdraws the Attorney General's discretion to
release such an alien on bond pending those proceedings.").

---

[15] This Court recognizes that there are many confounding
factors to such a study –- particularly the provision at issue
in this case which makes detention mandatory for those aliens
who are most likely to be ordered deported.  This Court also
notes that detention and representation are likely linked.
After all, a detained alien cannot work to earn money to pay for
representation, cannot help an attorney gather evidence (making
the attorney more expensive), and cannot solicit help from
family and friends in person to help pay for an attorney.

Mandatory detention ought not be taken so lightly both because it has such a dramatic effect on the outcome of deportation proceedings and because an individual's liberty is at stake. The rule of lenity thus supports a reading of section 1226(c) that limits mandatory detention only to situations where Congress has clearly called for it.

## III. CONCLUSION

This opinion does not prevent ICE from detaining even a single criminal alien.  ICE can detain even those aliens like Castaneda who were not detained by ICE immediately upon release from their custodial sentence.  This opinion merely makes that detention subject to an individualized bond hearing.  Moreover, this opinion does not frustrate ICE's efforts to subject currently confined criminal aliens to mandatory detention and prevent them from returning to our communities; ICE must merely detain them "when [they are] released," as the statutory language requires.

This Court rules that section 1226(c) applies only to those criminal aliens detained immediately upon release from criminal custody or within a reasonable period of time thereafter.  While it has no occasion in this case to determine what constitutes a reasonable period of time, this Court would suggest that any alien who has reintegrated back into his community has not been detained within such a reasonable period of time.  Castaneda,

30

having lived in her community for three years after even her probationary period was complete, must certainly receive an individualized bond hearing.

For the foregoing reasons, the motion to dismiss the habeas petition, ECF No. 6, was **DENIED** on June 10, 2013.  The petition for a writ of habeas corpus, ECF No. 1, was **GRANTED** on that same day.  Order, June 10, 2013 ECF No. 24.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE